UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

MARILYN CROSSLEY,

    Plaintiff,

vs.

KETTERING ADVENTIST
HEALTHCARE, *et al.*,

    Defendants.

Case No. 3:20-cv-319

District Judge Michael J. Newman
Magistrate Judge Caroline H. Gentry

---

**ORDER: (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 58); AND (2) TERMINATING THIS CASE ON THE DOCKET**

---

This is an employment discrimination case. Plaintiff Marilyn Crossley ("Crossley") sued her former employer, Kettering Adventist Healthcare ("Kettering Health"), and her former supervisor, Belinda Isaac ("Isaac"), after Kettering Health fired her from her speech language pathologist position. Her five-count complaint alleges: (1) disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a), *et seq.*, and Ohio law, Ohio Rev. Code § 4112.02(A) (Counts 1 and 2); (2) failure to accommodate her disability under the ADA, 42 U.S.C. § 12112(b)(5), (Count 3); and (3) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623, *et seq.*, and Ohio law, Ohio Rev. Code § 4112.02(A) (Counts 4 and 5). Doc. No. 7. Following the close of discovery, Defendants now move for summary judgment on each claim. Doc. No. 58. Crossley, through counsel, filed her opposition. Doc. No. 61. Defendants replied, Doc. No. 64, and this matter is ripe for review.

### I. Undisputed Facts

**A.  Kettering Health**

Kettering Health is a hospital network in the Dayton, Ohio and Cincinnati, Ohio areas. *See*

*About Us*, KETTERING HEALTH, https://ketteringhealth.org/about/ (last visited Mar. 20, 2023). Like most hospitals, Kettering Health routinely stores patient information for its daily operations. *See* Doc. No. 50-15. The Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d *et seq.*, generally prevents a medical provider from unauthorized disclosure of patients' private medical information to unauthorized outsiders. *See* 45 C.F.R. §§ 164.502(b)(1); 164.512(d)(2). "Covered entities" under HIPAA—including a hospital network like Kettering Health—"must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of [an authorized] use, disclosure, or request." *Id.* § 164.502(b)(1).

That is why Kettering Health adopted policies in its workplace handbook forbidding its employees from accessing or divulging patients' private health information (known as "PHI") in certain instances. *See* Doc. No. 50-15. Thus, Kettering Health's policies provide, "[a]ccess, to PHI by authorized individuals, is limited to what is minimally necessary to accomplish an individual's job duties, functions, and/or responsibilities." Doc. No. 55-3 at PageID 1072. Similarly, "[u]nauthorized access or accessing PHI that is not required to carry out an individual's job duties, functions, and/or responsibilities is in violation of this policy and may constitute a HIPAA violation." *Id.* These policies designate security and privacy violations in categories ranging from Category 1 through Category 5. Doc. No. 50-15 at PageID 1016. Category 3 violations are "[d]eliberate or purposeful violation[s] without harmful intent[,]" a category covering any "intentional violation due to curiosity or desire to gain information for personal use and without further disclosure to a third party." *Id.* Namely, that means "using PHI without a legitimate need to do so[.]" *Id.*

Kettering Health does, however, permit its employees to use and disclose PHI "for the

2

purposes of treatment, payment, and healthcare operations." Doc. No. 55-4 at PageID 1075. Permitted uses for treatment, for example, include "us[ing] a patient's PHI to provide him/her with treatment or services"; or, for payment, a Kettering Health employee can share PHI to collect the patient's bill. *Id.* at PageID 1076. Finally, Kettering Health employees can use and disclose PHI within the Kettering Health network of hospitals "for the purposes of its own operations." *Id.* Kettering Health regularly trains its employees on these policies, HIPAA, and how to comply with both. *See* Doc. No. 58-2 at PageID 1136. All employees can view these policies, in writing and online. Doc. No. 55 at PageID 1058.

When an employee violates company policy, Kettering Health generally utilizes progressive discipline. *See* Doc. No. 43 at PageID 448–49; Doc. No. 49-27 at PageID 767. This includes requiring employees to complete remedial steps and giving warnings before terminating employment. Doc. No. 49-27 at PageID 768–69. Still, Kettering Health decisionmakers can forego progressive discipline and move to termination for egregious policy violations. *Id.* at PageID 769; Doc. No. 43 at PageID 450.

### B. Crossley's Employment at Kettering Health

Crossley began working as a speech pathologist at Kettering Health's main campus in Kettering, Ohio in 2001. Doc. No. 39 at PageID 289. She was diagnosed with Ehlers-Danlos Syndrome ("EDS") in 2004—a degenerative tissue disorder that causes laxity, pain, and weakness in the joints. *Id.* at PageID 301. From 2010 until she was terminated in 2019, she worked in Kettering Health's NeuroRehab and Balance Center in Dayton, specializing in neuromuscular facial rehabilitation: treating patients with Bell's Palsy or certain facial tumors. *Id.* at PageID 290, 294. Isaac was Crossley's direct supervisor during her tenure at the NeuroRehab and Balance Center, and Isaac knew about Crossley's EDS diagnosis. Doc. No. 43 at PageID 401, 424.

Crossley testified that she felt like Kettering Health was pressuring her to retire in 2017.

3

Doc. No. 39 at PageID 291.  On April 14, 2017, Crossley turned 65.  *Id.*  Isaac and Crossley, along with other Kettering Health employees, had "a general discussion about retir[ement.]"  *Id.* at PageID 292; Doc. No. 43 at PageID 417.  Isaac mentioned that she wanted to retire at age 70, and asked Crossley how long she planned to work at Kettering Health.  Doc. No. 39 at PageID 292; Doc. No. 43 at PageID 417.

That same spring, Isaac spoke with Crossley about not using handicapped parking spaces at Kettering Health.  Doc. No. 39 at PageID 300; Doc. No. 43 at PageID 419.  When Crossley told Isaac that she had a validly-issued handicapped parking placard, Isaac indicated that she would bring the matter to H.R.  Doc. No. 39 at PageID 301; Doc. No. 58-1 at PageID 1133.  Ultimately, Isaac and H.R. determined that Crossley could use her preferred parking space of choice, so the matter never came up again.  Doc. No. 39 at PageID 301; Doc. No. 58-1 at PageID 1133.

Crossley was diagnosed with multiple myeloma and bone cancer in July of 2018, and she informed Kettering Health about it at that time.  Doc. No. 39 at PageID 302; Doc. No. 61-1 at PageID 1182.  She needed chemotherapy and a stem cell transplant for three months, so Isaac suggested that Crossley take three months off.  Doc. No. 39 at PageID 303; Doc. No. 43 at PageID 424.  Crossley testified that she pushed back, telling Isaac that her doctor wanted her to stick to her normal schedule during treatment.  Doc. No. 39 at PageID 303; *see also* Doc. No. 43 at PageID 424–25.  But ultimately, after completing her chemotherapy treatments, Crossley took leave from November 2018 until March 2019 to receive a stem cell transplant.  Doc. No. 39 at PageID 303–04; Doc. No. 43 at PageID 424–25.

Crossley took a cruise for cancer patients in early March 2019.  Doc. No. 39 at PageID 304, 312.  When she returned, she was ready to start working again.  *Id.*; Doc. No. 43 at PageID 426–27.  Before she returned, Kettering Health informed her that she needed to make sure that her

4

CPR certification—that Kettering Health required all employees to have—had not expired. Doc. No. 39 at PageID 304–05; Doc. No. 58-1 at PageID 1131–32. Crossley's certification expired, so she sought, and received, an exemption. Doc. No. 39 at PageID 306–07.[1] However, Kettering Health would not allow Crossley to work without a CPR-certified therapist on standby. *See* Doc. No. 58-1 at PageID 1131–32. This severely limited her work hours because the cost of scheduling a CPR therapist to "chaperone" Crossley "would have been unduly burdensome[,]" so Kettering Health did not schedule Crossley to work unless a CPR-certified therapist was available. *Id.*

To keep Crossley at the same hours she worked before her diagnosis, and to accommodate her CPR exemption, Kettering Health offered to schedule her to work on Wednesdays. *Id.* at PageID 1132; Doc. No. 39 at PageID 314. However, Crossley refused because "that was [her] day off." Doc. No. 39 at PageID 311, 313. Thus, Crossley agreed to work reduced part-time hours "to accommodate being in the department when others who[] are CPR certified would be available[.]" Doc. No. 49-16 at PageID 723; *see* Doc. No. 39 at PageID 310.

Kettering Health workers could be sent home from work if the hospital was overstaffed, *i.e.*, did not have enough patients to treat that day. Doc. No. 43 at PageID 437. When this happened to Crossley, she became suspicious that Kettering Health purposefully assigned her fewer patients to lower her productivity. Doc. No. 61-1 at PageID 1182.

That prompted her, on July 29, 2019, to check Kettering Health's patient charts for any eligible patients (those eligible for neuromuscular facial rehabilitation) to identify patients who could be assigned to her. *See* Doc. No. 49-22 at PageID 741. She emailed her concerns to Debra McConnell, a manager, complaining that her caseloads were too low compared to other therapists.

---

[1] Although it is unclear, Crossley testified that she attempted to perform the recertification test, had difficulty doing so, and ultimately chose to forego taking the test, instead opting for the exemption. *See* Doc. No. 39 at PageID 304–10. The evidence in the record shows that Crossley let her certification lapse, and nothing in the record suggests that it lapsed due to her disability. *See id.*

*Id.* McConnell promised to "look through the triage pile and see if there are any in there that could be potential speech patients for you." *Id.* at PageID 740. But later that day, McConnell warned Crossley in the hallway that she was not permitted to look at the PHI in those charts—even to check for eligible patients—under Kettering Health's HIPAA policy. Doc. No. 39 at PageID 330; Doc. No. 61-1 at PageID 1182. Crossley disagreed because, in her opinion, she could access the information for scheduling purposes. Doc. No. 39 at PageID 330.

These problems came to Isaac's attention later that day. Doc. No. 43 at PageID 439. McConnell reported them to Isaac, and Isaac emailed a higher-level supervisor, H.R. Director Megan Douglas ("Douglas"), to apprise her of the situation. Doc. No. 41 at PageID 368; Doc. No. 49-22 at PageID 739. Douglas, in turn, asked Audra Barkley and Megan Brickner, members of Kettering Health's Corporate Integrity Department ("Corporate Integrity"), if they could send a report listing every chart with PHI that Crossley accessed in the two weeks prior to July 29. Doc. No. 49-22 at PageID 738; Doc. No. 41 at PageID 379. Corporate Integrity did so and asked Isaac and Douglas to determine whether Crossley breached the policy. Doc. No. 41 at PageID 379; Doc. No. 43 at PageID 445; Doc. No. 49-22 at PageID 737.

Isaac reviewed the charts to determine whether Crossley had a legitimate business reason, per Kettering Health's PHI policy, for accessing them. Doc. No. 43 at PageID 445; *see also, e.g.*, Doc. No. 55-3 at PageID 1016. To do so, Isaac went into each patient chart to see if Crossley was actively treating that patient or had any interaction with that patient. Doc. No. 43 at PageID 445; *see also* Doc. No. 50-14 at PageID 967–1013. If Crossley was not actively treating those patients or involved in their treatment, Isaac determined that she had breached the HIPAA policy. Doc. No. 43 at PageID 441, 445. This led her—and Douglas, upon her review—to conclude that Crossley improperly accessed PHI without a legitimate business purpose 47 times. Doc. No. 49-

6

22 at PageID 737; Doc. No. 49-23.

On August 12, 2019, Douglas informed Corporate Integrity, claiming that Crossley committed "a category 3 violation[.]" Doc. No. 49-22 at PageID 737. This led Corporate Integrity to inquire if Douglas and Isaac would terminate Crossley's employment. *Id.* at PageID 736. The pair discussed Crossley's violations, once more, on August 13. Doc. No. 43 at PageID 446.

They met with Crossley two days later. *Id.*; Doc. No. 39 at PageID 334. At that meeting, they informed Crossley about their investigation, showed her a chart listing the patients whose files she had accessed, and asked her to explain her actions. Doc. No. 39 at PageID 334–35; Doc. No. 41 at PageID 382. Crossley testified that she read the charts and told Isaac and Douglas which patients she was assigned to actively treat. Doc. No. 39 at PageID 335. She explained that she "believe[d] the interpretation of the HIPAA law is that" that she could review PHI "for scheduling purposes" to see if she was not being assigned patients that she was eligible to treat. *Id.* at PageID 334; Doc. No. 41 at PageID 381; Doc. No. 43 at PageID 442–43. She also claimed that a computer issue caused her innocuous attempts to scroll past PHI to register incorrectly as "accessing" PHI in Kettering Health's database. *See* Doc. No. 41 at PageID 382.

That alleged technical issue prompted Douglas to ask Corporate Integrity on August 16 if Crossley's explanation was plausible, to which Barkley replied that only "clicking on the specific test patient you want to review will register" as accessing PHI. Doc. No. 49-22 at PageID 734. Isaac nonetheless concluded that Crossley "is definitely actively going into individual charts" and viewing PHI. *Id.* at PageID 733. Douglas and Isaac determined that Crossley was subject to termination at this point based on these violations. Doc. No. 41 at PageID 383; Doc. No. 43 at PageID 446; Doc. No. 49-25 at PageID 750 (indicating that, as of August 19, 2019, Douglas and Isaac intended to terminate Crossley "tomorrow").

7

Still, they wanted to "give her another benefit of the doubt" and decided to audit her, just to see if she improperly accessed PHI after the August 15 meeting. Doc. No. 43 at PageID 446; Doc. No. 49-25 at PageID 750. Upon request, Corporate Integrity provided Douglas and Isaac with another report listing Crossley's activity in patient charts from August 16 until August 20. Doc. No. 49-25 at PageID 750. Isaac determined that Crossley accessed PHI for three patients that Spencer Ambach, another facial rehabilitation therapist hired in 2018 and trained by Crossley, was treating. Doc. No. 43 at PageID 447; Doc. No. 49-26.

On August 20, 2019, Kettering Health—at a meeting between Crossley, Isaac, Douglas, and Alexander—terminated Crossley's employment. Doc. No. 43 at PageID 450–51. This decision came after Isaac, Douglas, Megan Sheldon (Kettering Health's Director of Compliance Programs/Privacy Officer, Doc. No. 58-2), Barkley, and Michelle Alexander (Isaac's supervisor), jointly agreed that termination, without employing progressive discipline, was appropriate. *See id.* at PageID 450–53; Doc. No. 58-2 at PageID 1136–37. Particularly, Sheldon "advised the other[s]" that "immediate termination was the appropriate disciplinary response" in this situation. Doc. No. 58-2 at PageID 1136–37. Kettering Health officials further testified that Crossley's improper PHI access violated multiple policies. *See* Doc. No. 43 at PageID 451–52 (noting Crossley's PHI access violated Kettering Health's "corporate integrity compliance code of conduct, [its] information security and privacy violation sanctioning guidelines, [its] conduct and discipline policy, and [its] standards of behavior policy"); Doc. No. 50-10 at PageID 949; Doc. No. 55 at PageID 1060.

## II. Motion for Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A) and (B). A court considering a motion for summary judgment must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. Analysis

Defendants are entitled to summary judgment. They had a legitimate, non-discriminatory reason for firing Crossley—violating Kettering Health's HIPAA policies—and Crossley's pretext arguments do not create a triable issue. Moreover, Defendants reasonably accommodated her disabilities.

#### A. Disability Discrimination Claims

"Title I of the [ADA] prohibits 'covered' employers from 'discharging' an employee because the employee is disabled, because the employee has a record of being disabled, or because the employer 'regards' the employee as disabled." *Babb v. Maryville Anesthesiologists, P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (emphasis deleted) (quoting 42 U.S.C. §§ 12102(1) and 12112(a)). A disability is a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

9

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

A plaintiff can show disability discrimination using indirect evidence under the *McDonnell Douglas* framework. *See, e.g.*, *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Ohio's disability discrimination law parallels the ADA in all relevant respects[.]" *Daughtery v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (citations omitted). Thus, "the same analytical framework" applies to Crossley's federal and Ohio law disability discrimination claims. *Id.* (citations omitted).

Under the *McDonnell Douglas* framework, (1) a plaintiff has the burden to establish a *prima facie* case; (2) if he or she can, the burden shifts to defendant to provide a legitimate, non-discriminatory reason for its action; and (3) if the defendant does so, the burden finally shifts back to the plaintiff to prove that this reason was mere pretext for unlawful discrimination. *See Thompson*, 985 F.3d at 522; *Anderson v. City of Blue Ash*, 798 F.3d 338, 356–57 (6th Cir. 2015). For a plaintiff to establish a *prima facie* case, he or she must prove that: "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open" while the employer searched for a replacement, "or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (quotation omitted). "To demonstrate pretext, a plaintiff may show that the defendant's proffered reason '(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003) (quoting *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 463 (6th Cir. 2003)).

Neither side addresses whether Crossley meets her *prima facie* case. The Court assumes,

*arguendo*, that the *prima facie* burden is satisfied here. With regard to a legitimate, non-discriminatory reason, Defendants contend they fired Crossley because she violated Kettering Health's HIPAA policies. *See* Doc. No. 58; *Goldblum v. Univ. of Cincinnati*, --- F.4th ---, No. 22-3289, 2023 WL 2446138, at *3 (6th Cir. Mar. 10, 2023) ("We have previously held that an employee's insubordination and her failure to follow company policies constitute legitimate, nonretaliatory reasons to terminate employment" (collecting cases)). The Court turns to pretext. Crossley finds pretext only under the second pretext prong: that Defendants' justification did not actually motivate her termination. *See* Doc. No. 61 at PageID 1171; Doc. No. 64 at PageID 1196. Under this prong, "the plaintiff admits the factual basis underlying the discharge and acknowledges that such conduct *could* motivate the dismissal, but attacks the employer's explanation by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant." *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (emphasis in original) (internal quotation marks and citation omitted). Ultimately, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (*en banc*) (citations omitted). Crossley offers seven instances tending to show Defendants had an illegal reason for terminating her. *See* Doc. No. 61. The Court considers her arguments in turn.

First, she maintains that Defendants did not adequately investigate her misconduct because it "pulled a report of every patient chart [Crossley] accessed for a two-week time period, determined which patients [Crossley] was not directly actively treating, and met with [Crossley] to tell her that she does not have a legitimate need to access information of patients she is not treating," but it did not "reference any Kettering policy prohibiting this activity." Doc. No. 61 at

11

PageID 1174; *see Tingle v. Arbors at Hilliard*, 692 F.3d 523, 531 (6th Cir. 2012) ("The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process"). However, an employer adequately investigates misconduct if it "made a reasonably informed and considered decision before taking the complained-of action[;]" the Court does not require "that the decisional process used by the employer be optimal or that it left no stone unturned." *Tingle*, 692 F.3d at 531 (internal quotation marks omitted) (first quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598–99 (6th Cir. 2007); and then quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1996)). There is no genuine dispute that Defendants informed Crossley in two conversations—one with McConnell, and one with Douglas and Isaac— that she violated company policy forbidding her from accessing PHI without a legitimate business reason. *See* Doc. No. 39 at PageID 330, 334–36; Doc. No. 41 at PageID 381; Doc. No. 43 at PageID 442–43. Isaac carefully reviewed the data reflecting each patient file that Crossley accessed and cross-referenced it with the patients that Crossley was actively treating. Doc. No. 43 at PageID 441, 446. As Crossley testified, Isaac and Douglas met with her; showed her the patient data she accessed; and explained why her actions violated company policy. Doc. No. 39 at PageID 334–35; Doc. No. 41 at PageID 382; Doc. No. 61-1 at PageID 1183. Moreover, it is inaccurate for Crossley to claim that Defendants never referenced the policy she violated, considering even she testified that Douglas and Isaac pointed her to its HIPAA policy as the basis for termination. *See* Doc. No. 39 at PageID 330, 334–36. These actions constituted an adequate investigation, and there is no genuine dispute as to this issue, so Crossley's unsupported assertion will not preclude summary judgment. *See, e.g.*, *Stephens v. Kettering Adventist Healthcare*, 182 F. App'x 418, 422 (6th Cir. 2006) (employer conducted an adequate investigation although "it did not learn the specifics . . . of some of the alleged incidents" because it interviewed complaining witnesses and

12

gave the plaintiff an opportunity "to respond" to the allegations); *Hale v. Mercy Health Partners*, 20 F. Supp. 3d 620, 632–33 (S.D. Ohio 2014).

Second, she notes that she disputed, and continues to dispute, Kettering Health's interpretation of its HIPAA policy. Doc. No. 61 at PageID 1174, 1176. Normally, that is irrelevant because of the "honest belief" rule: a doctrine holding that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) (quoting *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)). To avoid this, Crossley points to Sixth Circuit precedent indicating that the honest belief rule does not arise when considering arguments under the second pretext prong, *i.e.*, whether an employer's stated reason actually motivated its conduct. *See, e.g.*, *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 794 n.5 (6th Cir. 2006). *But see Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 287 n.6 (6th Cir. 2012) (finding it "problematic" that an employee relied on the second prong of pretext without conceding the underlying factual basis for the discharge). True. But this undercuts her claims, as she may only rely upon this prong to show pretext where she "admits the underlying factual basis" alleged to motivate her discharge. *Smith*, 220 F.3d at 759; *see also, e.g.*, *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). She does not admit those facts, considering she repeatedly alleged then, as she does now, that she did not violate Kettering Health's policies. *See* Doc. No. 61 at PageID 1174. Thus, to the extent that Crossley attempts to create a triable issue by claiming that she did not violate Kettering Health's policies and that this proffered reason has no basis in fact, the honest belief rule forecloses that claim. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008); *Tibbs v. Calvary United Methodist Church*, 505 F. App'x 508, 514 (6th

13

Cir. 2012) ("[A]rguing about the accuracy of the employer's assessment is a distraction because the question is not whether the employer's reasons for a decision are *right* but whether the employer's description of its reasons is *honest*" (emphasis in original) (quoting *Chrysler Corp.*, 155 F.3d at 806).[2]

Third, Crossley next alleges that Defendants' decision to terminate her rested on inconsistent reasons. Doc. No. 61 at PageID 1175. Her proof is that Isaac and Douglas testified that Crossley's actions violated more than one company policy. *See id.* Rather than being inconsistent, they referenced these policies to emphasize that her actions technically violated several company policies that all forbade employees from accessing PHI without authorization. *See* Doc. No. 43 at PageID 451–52; Doc. No. 50-10 at PageID 949; Doc. No. 55 at PageID 1058–60; Doc. No. 55-3. Thus, it is not genuinely disputed that Defendants consistently informed her that she violated Kettering Health's HIPAA policies. *See* Doc. No. 43 at PageID 451–52; Doc. No. 50-10 at PageID 949; Doc. No. 55 at PageID 1058–60; *see also, e.g.*, *Miles v. S. Cent. Hum. Res. Agency*, 946 F.3d 883, 891 (6th Cir. 2020) (noting that "providing *additional*, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications" (emphasis in original) (quoting *MacDonald-Bass v. J.E. Johnson*

---

[2] The cases that Crossley relies upon are also distinguishable. *See Merendo v. Ohio Gastroenterology Grp.*, No. 2:17-cv-817, 2019 WL 955132, at *13 (S.D. Ohio Feb. 27, 2019) (denying summary judgment only where the plaintiff could show that a supervisor instructed her to review patient information and then fired her for violating her employer's privacy policy); *Coone v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. 1:16-cv-481, 2018 WL 1004037, at *9–11 (E.D. Tenn. Feb. 21, 2018) (denying summary judgment where plaintiff presented discriminatory remarks made two weeks before her termination, showed that there was a dispute as to whether she admitted she accessed patient records without permission, and she used the cat's paw theory of liability to question whether decisionmakers were fed biased information). In contrast, it is genuinely undisputed that Crossley never had permission to access the records identified on August 15, 2019; and she incorrectly believed that she was authorized to review those records solely for scheduling purposes. *See* Doc. No. 39 at PageID 334; Doc. No. 43 at PageID 442–43; *see also, e.g.*, *Jones v. Unipres, USA, Inc.*, No. 3:12-cv-1089, 2013 WL 5782930, at *13 (M.D. Tenn. Oct. 28, 2013) (granting summary judgment where plaintiff could not provide additional evidence undermining employer's justification for termination when employer "regarded [Plaintiff's] conduct as the type of conduct for which immediate termination . . . was warranted").

*Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012))); *MacDonald-Bass*, 493 F. App'x at 726 (finding that employer's justification for firing plaintiff based on her physical ability "remained the same, albeit expanded, throughout this litigation").

Fourth, Crossley argues the policies were ambiguous, and asks this Court to infer that her policy violations did not motivate her termination. Doc. No. 61 at PageID 1175–76. But she rests this argument on her disagreement with how Kettering Health interprets its policy, which does not raise a triable issue of fact. *See Sybrandt v. Home Depot, USA, Inc.*, 560 F.3d 553, 561 (6th Cir. 2009) ("[T]he fact that there might be some ambiguity in [Defendant]'s Code of Conduct does not suffice to create a genuine issue of material fact about whether [Defendant]'s stated reason for terminating [Plaintiff] was a pretext designed to mask . . . discrimination" (citing *Allen*, 545 F.3d at 397–98)); *Vandine v. System*, No. 2:14-cv-1242, 2016 WL 5661691, at *5–6 (S.D. Ohio Sept. 30, 2016) (ambiguous interpretation of hospital's policy did not create triable issue where employer held honest belief as to employee's violation of the policy).

Fifth, Crossley contends it is unclear who determined that she breached Kettering Health's HIPAA policies. Doc. No. 61 at PageID 1176. The Court disagrees. The record demonstrates, without any genuine dispute, that Isaac investigated the data after Corporate Integrity instructed her to do so, and Isaac and Douglas confirmed that Crossley breached Kettering Health's policies. Doc. No. 41 at PageID 379; Doc. No. 43 at PageID 441, 445; Doc. No. 49-22 at PageID 737. Crossley's mere denial creates no triable issue. *See* Fed. R. Civ. P. 56(c).

Sixth, Crossley argues that Defendants' decision—not to employ progressive discipline—precludes summary judgment. Doc. No. 61 at PageID 1177–78. "[F]ailure to uniformly apply a progressive discipline policy can be evidence of pretext, especially when the company asserts that policy as a rationale for the employee's termination." *Miles*, 946 F.3d at 896 (citing *Lamer v.*

15

*Metaldyne Co.*, 240 F. App'x 22, 33 (6th Cir. 2007)). "An employer's failure to follow internal disciplinary protocols is most probative when coupled with evidence that the employer followed the protocols for people outside of plaintiff's protected class." *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 847 (6th Cir. 2015) (citing *Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 595 (6th Cir. 2006)). Nonetheless, this does not apply here, as there are no comparators. Nothing in the record shows that a Kettering Health, non-disabled employee accessed PHI and received progressive discipline. *See Miles*, 946 F.3d at 896 (rejecting reliance on progressive discipline policy where plaintiff "show[ed] no employee, even outside the protected class," received disparate discipline). Moreover, Kettering Health was not bound to follow a progressive discipline policy, considering its own handbook states that it may bypass that procedure if offenses are particularly egregious, which it reasonably found here. Doc. No. 49-27 at PageID 769; *see* Doc. No. 43 at PageID 450; *Miles*, 946 F.3d at 897; *Goldblum*, 2023 WL 2446138, at *6–7. Finally, "not every technical failure to follow disciplinary protocol is necessarily evidence of pretext." *Gunn*, 632 F. App'x at 847 (citations omitted). Considering Crossley cannot identify anything in the record to the contrary, Kettering Health's decision—to forego progressive discipline and terminate her employment—was not pretextual.

Seventh, Crossley also suggests that Isaac made discriminatory comments about her disability. *See* Doc. No. 61 at PageID 1178. As proof, she points to her issues with Isaac about using the handicapped placard, and her testimony that Kettering Health removed concussion patients from her patient load in 2014. *Id.*; *see* Doc. No. 39 at PageID 295. No reasonable juror could so conclude. Isaac and H.R. ultimately agreed that Crossley could park in a handicapped spot—undercutting her belief that this suggests Isaac held a discriminatory animus. *See* Doc. No. 39 at PageID 301; Doc. No. 58-1 at PageID 1133. Even assuming Crossley's depiction of these

16

events is accurate, both events occurred long before her termination and are "unrelated to the decisional process[,]" so they do not "demonstrate [Crossley's] burden of demonstrating animus." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (quoting *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998)).[3]

In sum, Crossley has not met her burden to overcome Kettering Health's legitimate, non-discriminatory reason for firing her. Therefore, summary judgment is warranted on her disability discrimination claims.[4]

### B. Age Discrimination Claims

The ADEA makes it "unlawful for an employer to . . . discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). "Plaintiffs must 'prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the but-for cause of the challenged employer decision.'" *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 323–24 (6th Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)). A plaintiff who "attempt[s] to show age discrimination with circumstantial evidence" proceeds through "the three-step burden shifting analysis" from *McDonnell Douglas*. *Id.* at 324. Indirect-evidence age discrimination claims under Ohio law also rely on this analysis. *See Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 727 (6th Cir. 2007) (citations omitted).

---

[3] Crossley also alleges that she received text messages allegedly from Kettering Health after her termination inviting her to apply to be a speech pathologist. *See* Doc. No. 61 at PageID 1178. It is unclear how this shows discriminatory animus. *Cf. McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (alteration in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Reg. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))).
[4] Crossley relies upon the same arguments for her Ohio disability discrimination claim to show pretext, including the allegation that these instances show that Isaac is individually liable under Ohio law for discrimination. *See* Doc. No. 61; *see, e.g.*, *Daughtery*, 544 F.3d at 702. For the reasons stated above, she cannot.

17

Crossley's pretext arguments for age discrimination, under federal and Ohio law, largely mirror her pretext arguments for disability discrimination, so they fail for the reasons stated above. *See* Doc. No. 61. The only difference arises in her assertion that the following actions and statements demonstrate that Defendants did not actually fire her for violating company policy:

- Isaac asked Crossley to take down photographs of her grandchildren in 2014;

- Isaac, in 2017, "overdisciplined [Crossley] while demonstrating preference for a younger employee" when it disciplined her for an argument with a younger therapist; and

- In 2017, "Isaac directly asked [Crossley] whether she planned to retire[,] and suggested that [she] should retire."

Doc. No. 39 at PageID 1177. However, these instances do not substantiate Crossley's age discrimination claims. For one thing, no evidence in the record supports Crossley's assertion that the "general discussion about retiring" was, in fact, a suggestion that she ought to retire. Doc. No. 39 at PageID 292; Doc. No. 43 at PageID 417. Even so, all three instances are so unrelated to the decision-making process—occurring years before Isaac investigated Crossley's violations of company policy—and distant from discriminatory animus that they fail to create a genuine issue of material fact concerning pretext. *See Bush*, 161 F.3d at 369; *see also, e.g.*, *Ford Motor*, 782 F.3d at 768 (noting that "decisionmakers' . . . actions outside of the decisionmaking process" cannot prove pretext alone); *Shrivastava v. RBS Citizens Bank, N.A.*, 227 F. Supp. 3d 824, 841 (E.D. Mich. 2017) (general discussion about retirement date was not indirect evidence of age discrimination). The Court shall thus grant summary judgment on Crossley's age discrimination claims.[5]

---

[5] Crossley relies on the same arguments to prove age discrimination under Ohio law as she does under federal law, so summary judgment is warranted on that claim for the reasons stated above. *See* Doc. No. 61; *Daughtery*, 544 F.3d at 702.

### C. Failure to Accommodate

Crossley does not respond to Kettering Health's summary judgment request on her failure to accommodate claim. Doc. No. 61. Nonetheless, Defendants must prove that no genuine dispute of material fact exists concerning this uncontested claim. *See Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017) ("[T]he moving party 'always bears the burden of demonstrating the absence of a genuine issue as to a material fact,' and the district court is required 'to examine the movant's motion for summary judgment to ensure that he has discharged that burden'" (quoting *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991))). *But see Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment" (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011))).

The ADA's broad definition of "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability[,] . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). A "reasonable accommodation" includes affording an employee a "part-time . . . work schedule[]" under the ADA. *Id.* § 12111(9). Crossley "bears the burden of establishing (1) that [she] is disabled, and (2) that [she] is 'otherwise qualified for the position despite [her] disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (internal quotations omitted) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)). "Importantly, an employee cannot force [his or] her employer to provide a specific accommodation if the employer offers another

19

reasonable accommodation. If an employee rejects a reasonable accommodation, the individual is no longer considered a 'qualified individual with a disability.'" *Talley v. Fam. Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1108 (6th Cir. 2008) (citation omitted) (quoting *Hedrick v. W. Res. Care Sys. & Forum Health*, 355 F.3d 444, 457 (6th Cir. 2004)).

Defendants are correct; Crossley's failure to accommodate claim cannot survive summary judgment. In her complaint, she alleged that Kettering Health failed to accommodate her "when her CPR certification allegedly expired" and "when it refused to engage in an interactive process to find an effective accommodation and instead reduced [her] employment status to part-time." Doc. No. 7 at PageID 33–34. But, as Defendants point out, Kettering Health exempted her from the CPR certification requirement upon request, even though it reduced her to part-time hours, and offered to schedule her to work on Wednesdays to maintain a full-time schedule. Doc. No. 39 at PageID 306–07, 311, 314. Because it is genuinely undisputed that Defendants, by offering her to work on Wednesdays and give her a part-time schedule, "offer[ed] another reasonable accommodation" and she rejected both, they are entitled to summary judgment. *Talley*, 542 F.3d at 1108; *see also Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 620–22 (N.D. Ohio 2014) (collecting cases where employer was entitled to summary judgment for proposing a reasonable accommodation to an employee that the employee rejected).

## IV.

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**. Doc. No. 58. This case is **TERMINATED** on the docket.

**IT IS SO ORDERED.**

March 20, 2023                                             s/Michael J. Newman
                                                                   Hon. Michael J. Newman
                                                                   United States District Judge